

**FILED & ENTERED**

**JAN 07 2019**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY gonzalez DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Liberty Asset Management Corporation, Debtor. | Case No.:   2:16-bk-13575-ER |
| | Chapter:    11 |
| | **MEMORANDUM OF DECISION DENYING  OBJECTIONS TO PROOFS OF CLAIM** |
| | Date:       December 4, 2018<br>Time:       10:00 a.m.<br>Location:   Courtroom 1568<br>            Roybal Federal Building<br>            255 East Temple Street<br>            Los Angeles, CA 90012 |

At the above-captioned date and time, the Court conducted a hearing on five objections to Proofs of Claim (collectively, the "Claim Objections") filed by Oak River Asset Management LLC ("Oak River") and the Plan Administrator under the Confirmed First Amended Chapter 11 Plan of Liquidation dated January 31, 2018 for Liberty Asset Management Corporation (the "Plan Administrator," and together with Oak River, the "Movants").[1] Appearances were as stated

---

[1] The Court considered the following papers in adjudicating the Claim Objections:
  1) Papers filed in the Oak River case [Case No. 2:16-bk-19233-ER]:
       a) Notice of Motion and Motion for Order Disallowing Certain Proofs of Claim [Doc. No. 152] (the "Claim Objection")
       b) Response to Objection to Claim [Doc. No. 162]
            i) Declaration of David S. Henshaw in Support of Response to Objection to Claim [Doc. No. 162-1] (the "Henshaw Decl.")

on the record. At the conclusion of the hearing, the Court took the matter under submission to consider additional arguments made by Movants, and to determine whether further evidence and briefing on the Claim Objections was required.

Having considered Movants' additional arguments, and having reviewed the record in the cases of Oak River and Liberty Asset Management Corporation ("Liberty"), the Court finds that no additional evidence or briefing on the Claim Objections is necessary. For the reasons set forth below, the Court finds that the following claimants hold general unsecured claims against Oak River's estate in the following amounts:

1)  AHA 2012 LLC ("AHA")—$720,000;
2)  YCJS 2012 LLC ("YCJS")—$900,000; and
3)  Frank Lee, as Trustee of the Lee Living Trust Dated 6/23/1987, and Christopher Lee (the "Lee Investors")—$900,000.

The Court further finds that to the extent Oak River's estate does not contain sufficient funds to pay in full the claims of AHA, YCJS, and the Lee Investors (collectively, the "Claimants"), Claimants hold general unsecured claims for the remaining unpaid amounts against the Liberty estate.[2]

## I. Facts and Summary of Pleadings

Liberty commenced a voluntary Chapter 11 petition on March 21, 2016. Oak River commenced a voluntary Chapter 11 petition on July 12, 2016. From March 21, 2016 to January 29, 2017, the Hon. Thomas B. Donovan presided over Liberty and Oak River's cases. On January 30, 2017, both cases were reassigned to the undersigned Judge.

---

   ii) Declaration of Olivia Chang in Support of Response to Objection to Claim [Doc. No. 162-2] (the "Chang Decl.")
   iii) Declaration of Frank Lee in Support of Response to Objection to Claim [Doc. No. 162-3] (the "Lee Decl.")
   iv) Declaration of Yuchi Wang in Support of Response to Objection to Claim [Doc. No. 162-4] (the "Wang Decl.")
  c) Movants' Reply Brief in Support of Motion for Order Disallowing Proofs of Claim Nos. 2, 3, and 4 [Doc. No. 165]
 2) Papers filed in the Liberty case [Case No. 2:16-bk-13575-ER]:
  a) Plan Administrator's Limited Objection to Claim Number 2-1 Filed by YCJS 2012 LLC [Doc. No. 823]
   i) Notice of Objection to Claim [Doc. No. 822]
  b) Plan Administrator's Limited Objection to Claim Number 3-1 Filed by the Lee Living Trust and Christopher Lee [Doc. No. 820]
   i) Notice of Objection to Claim [Doc. No. 819]
  c) Plan Administrator's Limited Objection to Claim Number 4-1 Filed by AHA 2012 LLC [Doc. No. 816]
   i) Notice of Motion for: Plan Administrator's Limited Objection to Claim Number 4-1 Filed by AHA 2012 LLC [Doc. No. 815]
   ii) [Amended] Notice of Objection to Claim [Doc. No. 821]
  d) Response to Objections to Claims [Doc. No. 835]
  e) Plan Administrator's Reply Brief in Support of Limited Objections to Claim Numbers 2, 3, and 4 Filed by YCJS 2012 LLC, the Lees, and AHA 2012 LLC [Doc. No. 837]
[2] Identical versions of this Memorandum of Decision will be docketed in the Liberty and Oak River cases.

On June 18, 2018, the Court entered an order in the Liberty case confirming the *First Amended Chapter 11 Plan of Liquidation Dated January 31, 2018*[3] (the "Liberty Plan," and the order confirming the Liberty Plan, the "Liberty Confirmation Order").[4] The Liberty Plan appointed Bradley D. Sharp as the Plan Administrator responsible for liquidating the assets of Liberty's estate. Among other things, the Liberty Plan provides that Liberty holds 100% of Oak River's equity. Consequently, the Liberty Plan provides that any surplus proceeds from Oak River's estate will be distributed to creditors of Liberty's estate.

AHA, YCJS, and the Lee Investors have filed identical Proofs of Claim against the Liberty and Oak River estates. At issue is whether Claimants are entitled to receive a distribution from Liberty's estate, from Oak River's estate, or from both estates. Because more claims have been filed against the Liberty estate than the Oak River estate, Claimants' distribution will be significantly larger if it is initially paid from Oak River's estate. Claimants assert that they are entitled to receive a distribution from Oak River's estate, as well as a distribution from Liberty's estate if Oak River's estate does not contain sufficient funds to pay their claims in full. Movants assert that Claimants are entitled to receive a distribution only from Liberty's estate.

The claims arise from Claimants' attempt to invest in real property located at 119 Furlong Lane, Bradbury, CA 911008 (the "Furlong Property"). Pursuant to this objective, each claimant executed a contract titled *Disclosure Acknowledgment and Commitment to Purchase and Sell Real Property Agreement* (the "Purchase and Sale Agreement").[5] The contracts were substantially identical. Each Purchase and Sale Agreement was entered into between the Claimant, on the one hand, and "Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates," on the other hand.[6] The Purchase and Sale Agreements required Liberty and/or its subsidiaries and affiliates to purchase the Furlong Property on the Claimants' behalf, after which each Claimant would receive a fractional interest in the Furlong Property proportionate to the Claimant's investment. The Purchase and Sale Agreements further provided:

> The investor acknowledges that LAMC is not the current owner of the real property [the Furlong Property] … but has the same under purchase contract with its rights as Purchaser thereunder freely assignable to the investor ….[7]

Each Claimant anticipated that after Liberty purchased the Furlong Property on their behalf, the Furlong Property would quickly be sold for a substantial profit.[8] After several months, Claimants became suspicious as to why the Furlong Property had not been sold.[9] At several

---

[3] Liberty Doc. No. 609, Ex. A. (All references to the "Liberty Doc." are to Case No. 2:16-bk-13575-ER. All references to the "Oak River Doc." are to Case No. 2:16-bk-19233-ER).

[4] Liberty Doc. No. 665.

[5] *See* Declaration of Olivia Chang in Support of Response to Objection to Claim [Oak River Doc. No. 162] (the "Chang Decl.") at Ex. A (AHA Purchase and Sale Agreement) (defined in Section I.A.); Declaration of Frank Lee in Support of Response to Objection to Claim (the "Lee Decl.") at Ex. A (Lee Purchase and Sale Agreement) (defined in Section I.B.); and Declaration of Yuchi Wang in Support of Response to Objection to Claim (the "Wang Decl.") at Ex. A (YCJS Purchase and Sale Agreement) (defined in Section I.C.).

[6] AHA Purchase and Sale Agreement at Preamble; Lee Purchase and Sale Agreement at Preamble; and YCJS Purchase and Sale Agreement at Preamble.

[7] AHA Purchase and Sale Agreement at ¶1.10; Lee Purchase and Sale Agreement at ¶1.10; and YCJS Purchase and Sale Agreement at ¶1.10.

[8] *See* Chang Decl. at ¶10; Lee Decl. at ¶3; and Wang Decl. at ¶3.

[9] *See* Chang Decl. at ¶¶14–15 and Lee Decl. at ¶¶11–12.

times during 2014 and 2015, certain of the Claimants met with Benjamin Kirk and Shelby Ho to discuss the status of the Furlong Property.[10] After these discussions provided fruitless, on January 19, 2016, Claimants commenced litigation against Liberty, Oak River, and other parties in the Los Angeles Superior Court.[11] Claimants asserted causes of action for breach of contract, intentional misrepresentation, negligent misrepresentation, rescission, unfair competition, violation of the Corporate Securities Law of 1968, conversion, conspiracy, and alter ego.[12] Only the causes of action for conspiracy and alter ego were pleaded against Oak River.[13]

On June 17, 2016, the litigation was removed to the Bankruptcy Court pursuant to 28 U.S.C. §1452(a). An adversary proceeding is pending in the Liberty bankruptcy, but litigation has been stayed by mutual consent of the parties.

Paragraph 8 of the Proof of Claim form requires the claimant to identity the basis for the claim. The initial Proofs of Claim filed by each Claimant identified the basis for the claim as "breach of contract." On November 19, 2018—subsequent to the filing of the instant Claim Objections—each Claimant filed an Amended Proof of Claim. The Amended Proofs of Claim are identical to the initial Proofs of Claim, except that the Amended Proofs of Claim set forth additional bases for the claims in response to Paragraph 8. Specifically, in addition to "breach of contract," the Claimants assert that the claims are based upon "quasi contract, constructive trust, fraud, conspiracy to defraud, [and] conversion [of] equity."

## A. AHA's Claim

AHA asserts an unsecured claim in the amount of $959,868.49. Olivia Chang is a member of AHA.[14] In February 2012, Tsai Luan Ho, aka Shelby Ho, acting on behalf of Liberty, spoke to Ms. Chang regarding an investment opportunity in two condominiums located in San Mateo, California (the "San Mateo Properties").[15] On March 5, 2012, Ms. Chang caused AHA to invest $644,000 with Liberty, for the purpose of acquiring the San Mateo Properties.[16] Ms. Chang no longer has the documents memorializing this transaction. *Id.* At the same time, Ms. Chang caused AHA to invest an additional $500,000 with Liberty to purchase a loan against real property located at 3020 Kirkham Street, San Francisco, California (the "Kirkham Property").[17]

On March 9, 2012, Ms. Chang transferred $1,144,000 to Arch Escrow on account of the investments in the San Mateo and Kirkham Properties.[18] Liberty never transferred title to the San Mateo Properties to AHA or to Ms. Chang.[19]

In June 2012, Ms. Ho informed Ms. Chang that Liberty's principal, Benjamin Kirk, wanted Liberty to retain the San Mateo Properties.[20] On July 25, 2012, Ms. Chang caused AHA to execute a *Cancellation of Real Estate Owned/Non-Performing Notes Purchase and Sale Agreement and Release of Deposit* (the "Cancellation Agreement").[21] The Cancellation

---

[10] *See* Lee Decl. at ¶¶12–14; Wang Decl. at ¶9.
[11] *See* Decl. of Lawrence Perkins [Oak River Doc. No. 152] at Ex. E.
[12] *Id.*
[13] *Id.*
[14] Chang Decl. at ¶1.
[15] *Id.* at ¶3.
[16] *Id.* at ¶4.
[17] *Id.* at ¶5 and Ex. A.
[18] *Id.* at ¶6 and Ex. B.
[19] *Id.*
[20] *Id.* at ¶7.
[21] *Id.* at ¶7 and Ex. C.

Agreement required Liberty to refund $644,000 to AHA within two business days.[22] Liberty did not refund the $644,000 to AHA or to Ms. Chang.[23]

In lieu of the refund, Mr. Kirk told Ms. Chang that an investment opportunity in the Furlong Property was available.[24] Mr. Kirk and Ms. Ho told Ms. Chang that Liberty owned the Furlong Property.[25] Mr. Kirk promised that he had already solicited a buyer for the Furlong Property at a purchase price that would double AHA's investment.[26]

On November 27, 2012, Ms. Chang caused AHA to execute a *Disclosure Acknowledgment and Commitment to Purchase and Sell Real Property Agreement* (the "AHA Purchase and Sale Agreement"). The AHA Purchase and Sale Agreement was entered into between AHA, on the one hand, and "Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates," on the other hand.[27] Pursuant to the AHA Purchase and Sale Agreement, Liberty and/or its affiliated companies were required to purchase the Furlong Property on AHA's behalf, so that AHA could obtain an 8% interest in the Property.[28]

### B. The Lee Investor's Claim

The Lee Investors assert an unsecured claim in the amount of $959,868.49. Frank Lee is the trustee of The Lee Living Trust dated 06/23/1987 (the "Lee Trust").[29] In February 2013, Mr. Lee met with Ms. Ho to discuss an investment opportunity in the Furlong Property.[30] On February 25, 2013, Mr. Lee and his son, Christopher Deryen Lee, executed a *Disclosure Acknowledgment and Commitment to Purchase and Sell Real Property Agreement* (the "Lee Purchase and Sale Agreement").[31] Like all the Purchase and Sale Agreements at issue, the Lee Purchase and Sale Agreement provided that Liberty and/or its affiliated companies would purchase the Furlong Property on the Lee Investor's behalf, and that subsequent to the purchase, the Lee Investors would obtain a fractional interest in the Furlong Property proportionate to their investment.[32]

On February 26, 2013, Mr. Lee wired $900,000 to Sincere Escrow with the expectation of acquiring a 10% interest in the Furlong Property.[33]

### C. YCJS' Claim

YCJS asserts an unsecured claim in the amount of $1,210,191.78. Yuchi Wang is a member of YCJS.[34] In September 2012, Mr. Wang discussed investing in the Furlong Property with Ms. Ho.[35] In October 2012, Ms. Wang caused YCJS to execute a *Disclosure Acknowledgment and Commitment to Purchase and Sell Real Property Agreement* (the "YCJS Purchase and Sale Agreement").[36] The YCJS Purchase and Sale Agreements was substantially identical to the

---

[22] *Id.* at ¶8.
[23] *Id.*
[24] *Id.* at ¶9.
[25] *Id.*
[26] *Id.* at ¶10.
[27] *Id.* at ¶11 and Ex. D.
[28] *Id.* at ¶12.
[29] Lee Decl. at ¶1.
[30] *Id.* at ¶3.
[31] *Id.* at ¶4.
[32] *Id.* at Ex. A.
[33] *Id.* at ¶¶5–7.
[34] Wang Decl. at ¶1.
[35] *Id.* at ¶3.
[36] *Id.* at ¶4.

Purchase and Sale Agreements executed by AHA and the Lee Investors. Like those agreements, the YCJS Purchase and Sale Agreement provided that Liberty and/or its affiliated companies would purchase the Furlong Property on YCJS' behalf, and that YCJS would obtain a fractional interest in the Furlong Property in proportion to the amount that it had invested.[37]

To consummate the transaction, Ms. Wang caused her husband to make five wire transfers to Skyline Escrow during the month of October 2012, in the total amount of $900,000.[38]

**D. Summary of Papers Filed in Connection with the Claim Objections**

Movants assert that Claimants do not hold valid claims against Oak River's estate, because each Purchase and Sale Agreement was entered into with Liberty, not Oak River. Claimants contend that the Purchase and Sale Agreements are enforceable against Oak River. Claimants point out that the contracts were executed by "Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates," and contend that Oak River is a wholly-owned subsidiary of Liberty.

Claimants assert multiple theories of recovery against Oak River. First, Claimants argue that Oak River, as a subsidiary of Liberty, is a party to the Purchase and Sale Agreements, and is liable for breach of contract damages. Second, Claimants assert that they are entitled to restitution in lieu of breach of contract damages, because the contract with Liberty was procured by fraud. Third, Claimants contend that they are entitled to imposition of a constructive trust to prevent unjust enrichment. Fourth, Claimants assert that they are entitled to compensation from Oak River on the grounds of fraud. Fifth, Claimants assert that Oak River is liable as a conspirator in a scheme to retain the Furlong Property for the benefit of Liberty and itself.

Movants dispute each of these theories of recovery. First, Movants contend that Oak River is not liable for breach of contract because it is not a named party to any of the Purchase and Sale Agreements. Second, Movants argue that Oak River would not be unjustly enriched if Claimants were required to receive their recovery from Liberty's estate rather than Oak River's estate. Movants emphasize that all net equity from Oak River's estate will be distributed to creditors of the Liberty estate. Third, Movants assert that Claimants' constructive trust theory fails, because Claimants (1) cannot trace their investment to either Oak River or the purchase of the Furlong Property, and (2) a constructive trust would unjustly enrich the Claimants at the expense of other Liberty investors.

Movants argue that allowing Claimants to recover against the Oak River estate would contravene the bankruptcy policy of ratable distribution among all creditors. Movants emphasize that many investors have been defrauded by the activities of Liberty and its various subsidiaries, and that allowing Claimants to recover against a specific subsidiary would unjustly enrich Claimants to the detriment of other victims of Liberty's fraudulent activities.

**E. Summary of Arguments Made at the Hearing**

Prior to the hearing, the Court issued a tentative ruling (the "Tentative"), indicating its intent to find that (1) Claimants held general unsecured claims against the Oak River estate, and (2) that to the extent the Oak River estate did not contain sufficient funds to pay Claimants' claims in full, Claimants held general unsecured claims for the remaining unpaid amounts against the Liberty estate. The Tentative concluded that Oak River was a wholly-owned subsidiary of Liberty at the time the Purchase and Sale Agreements were executed. The Tentative found that as

---

[37] *Id.* at ¶4 and Ex. A.
[38] *Id.* at ¶5 and Ex. B.

a result the Agreements were enforceable against Oak River, based on language providing that each Agreement was entered into between the Claimant, on the one hand, and Liberty and "its respective parent or subsidiary companies and affiliates," on the other hand.

The Plan Administrator opposed the Tentative, arguing that although Oak River is beneficially owned by Liberty today, it was not owned by Liberty at the time the Purchase and Sale Agreements were executed. The Plan Administrator made the following arguments in support of this position:

1) Liberty's beneficial ownership of Oak River was not determined until subsequent to the date of Liberty's bankruptcy petition. There is no evidence before the Court that Oak River was an affiliate or subsidiary of Liberty at the time the Purchase and Sale Agreements were executed in 2012 and 2013. For example, the contemporaneous public records filed by Oak River do not establish any affiliate or subsidiary relationship between Oak River and Liberty.

2) Pursuant to the Statute of Frauds, codified at Cal. Civ. Code §1624(a)(3), the Purchase and Sale Agreements are not enforceable against Oak River. The Statute of Frauds requires that Oak River's authority to act as an agent of Liberty in purchasing the Furlong Property be set forth in a writing subscribed to by Oak River. No such writing exists.

## II. Findings and Conclusions

Section 502 requires the Court to disallow a claim that "is unenforceable against the debtor and the property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."

Under Bankruptcy Rule 3001(f), a proof of claim executed and filed in accordance with the Bankruptcy Rules constitutes prima facie evidence of the validity and amount of the claim. To overcome the presumption of validity created by a timely-filed proof of claim, an objecting party must do one of the following: (1) object based on legal grounds and provide a memorandum of points and authorities setting forth the legal basis for the objection; or (2) object based on a factual ground and provide sufficient evidence (usually in the form of declarations under penalty of perjury) to create triable issues of fact. *Durkin v. Benedor Corp. (In re G.I. Indus., Inc.)*, 204 F.3d 1276, 1280 (9th Cir. BAP 2000); *United States v. Offord Finance, Inc. (In re Medina)*, 205 B.R. 216, 222 (9th Cir. BAP 1996); *Hemingway Transport, Inc. v. Kahn (In re Hemingway Transport, Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993). Upon objection, a proof of claim provides "some evidence as to its validity and amount" and is "strong enough to carry over a mere formal objection without more." *See Lundell v. Anchor Constr. Spec., Inc.*, 223 F.3d 1035, 1039 (9th Cir. 2000) (citing *Wright v. Holm (In re Holm)*, 931 F.2d 620, 623 (9th Cir. 1991)). An objecting party bears the burden and must "show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *Holm*, 931 F.2d at 623. When the objector has shown enough evidence to negate one or more facts in the proof of claim, the burden shifts back to the claimant to prove the validity of the claim by a preponderance of evidence. *See Lundell*, 223 F.3d at 1039 (citation omitted).

To determine whether the claims are enforceable against Oak River, the Court looks first to the Purchase and Sale Agreements upon which each Claim is based. As noted, each Purchase and Sale Agreement was entered into between the Claimant, on the one hand, and "Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates," on the other hand.

There is no dispute that, at the present time, Liberty owns a 100% equity interest in Oak River. Claimants contend that at the time the Purchase and Sale Agreements were executed, Oak River was a subsidiary and/or affiliate of Liberty. On this basis, Claimants assert that the Purchase and Sale Agreements are enforceable against Liberty. The Plan Administrator argues that there is no evidence that Oak River was a subsidiary and/or affiliate of Liberty at the time the Purchase and Sale Agreements were executed, and that accordingly the Claimants hold no enforceable contractual rights against Oak River and are therefore entitled to receive a distribution only from Liberty's estate.

## A. Liberty's Ownership Interest in Oak River

The positions taken by various parties with respect to Liberty's ownership interest in Oak River has evolved throughout these cases. A review of these evolving positions, as well as a review of the Court's findings on the issue, provides necessary context for assessing the Plan Administrator's argument.

Liberty commenced its voluntary Chapter 11 petition on March 21, 2016. Liberty filed a complete set of schedules on April 5, 2016.[39] In the April 5 schedules, Liberty asserted a "20% beneficial interest" in Oak River.[40] On June 7, 2016, Liberty filed amended schedules, in which it asserted a "[p]artial beneficial interest" in Oak River.[41]

On July 12, 2016, Oak River commenced its voluntary Chapter 11 petition. Oak River's petition was signed by Lawrence Perkins, in his capacity as Oak River's "authorized agent."[42] At the time, Mr. Perkins was serving as Liberty's Chief Restructuring Officer ("CRO").[43] Oak River's June 12, 2016 schedules provided that its equity was held by the following persons and entities:

1) 16% equity interest held by AHA;
2) 4% equity interest held by Christopher Deryen Lee;
3) 16% equity interest held by the Lee Trust;
4) 44% equity interest held by Liberty; and
5) 20% equity interest held by YCJS.[44]

On September 27, 2016, the Court granted Oak River's application to employ Mr. Perkins as its CRO, with such employment effective as of July 12, 2016.[45] On January 25, 2018, Oak River filed a *List of Equity Security Holders—Amended*, which provided that Liberty held 100% of Oak River's equity.[46] The *List of Equity Security Holders—Amended* was signed by Mr. Perkins in his capacity as Oak River's CRO.[47]

---

[39] Liberty Doc. No. 34.

[40] Schedule A/B [Liberty Doc. No. 34] at ¶15.7.

[41] Amended Schedule A/B [Liberty Doc. No. 90] at ¶15.7.

[42] Oak River Doc. No. 1.

[43] On June 9, 2016, the Court entered an order authorizing Liberty to employ Mr. Perkins as its CRO, with such employment effective as of March 28, 2016. Liberty Doc. No. 94.

[44] List of Equity Security Holders [Oak River Doc. No. 1].

[45] *See* Order Approving Motion for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing and Approving Employment and Retention of Lawrence R. Perkins as Chief Restructuring Officer [Oak River Doc. No. 53].

[46] Oak River Doc. No. 113.

[47] *Id.*

On June 18, 2018, the Court confirmed the Liberty Plan, which provides that Oak River is an "Investment Entity" of Liberty.[48] The Liberty Plan defines an "Investment Entity" as "a single purpose limited liability entity set up to acquire assets, which was capitalized with funds provided by" Liberty.[49] The Liberty Plan and Liberty Plan Confirmation Order contain no express findings regarding Liberty's ownership of Oak River. However, the Liberty Plan provides for the distribution of Oak River's equity to Liberty's estate, a distribution which would be impermissible unless Liberty owned 100% of Oak River's equity. Consequently, implicit in the Liberty Confirmation Order is a finding that Liberty owns 100% of Oak River's equity.

At the hearing, the Plan Administrator stated that Liberty's 100% ownership interest in Oak River had been established by findings made by Judge Donovan in the adversary proceeding *Official Unsecured Creditors Committee for Liberty Asset Management Corporation v. Lucy Gao and Benjamin Kirk* (the "Kirk/Gao Adversary Proceeding").[50] To ensure a clear record, the Court finds it necessary to provide clarification with respect to this statement. On January 25, 2017, Judge Donovan entered findings of fact (the "Jan. 25 Findings"),[51] which provided, among other things, that Liberty made use of various Investment Entities[52] in the operation of its business, and that "all of the property held by the Investment Entities is actually owned by" Liberty.[53] The Jan. 25 Findings did not, however, specifically designate Oak River as such an Investment Entity, although the definition of "Investment Entity" was non-exclusive.

**B. Destruction of Records Pertaining to the Business Relationship Between Liberty and Oak River**

The difficulties faced by Mr. Perkins and other interested parties in understanding Liberty's ownership interest in Oak River were caused by the malfeasance of Ms. Gao. As found in the Kirk/Gao Adversary Proceeding, Ms. Gao was a manager at Liberty who was responsible for overseeing its accounting and record-keeping functions.[54] After an investigator hired by the Official Committee of Unsecured Creditors appointed in Liberty's case (the "Liberty Committee") observed a document shredding truck at Liberty's offices, the Liberty Committee filed an emergency motion to force Liberty to turnover documents and information in its possession.[55] By the time the Liberty Committee obtained an order granting its turnover motion, many of Liberty's documents had already been consigned to the shredder. Ms. Gao supervised the document shredding.[56]

---

[48] *See* Liberty Plan [Liberty Doc. No. 609, Ex. A] at 11 (providing that "'Oak River' means Oak River Asset Management, an Investment Entity of the Debtor").

[49] *Id.* at 9.

[50] Adv. No. 2:16-ap-01337-ER.

[51] *See* Findings of Fact and Conclusions of Law Regarding Motion by the Official Committee of Unsecured Creditors for Summary Adjudication of Defendants' Liability for Breach of Fiduciary Duties and Accounting [Doc. No. 57, Adv. No. 2:16-ap-01337-ER] (the "Jan. 25 Findings").

[52] The Jan. 25 Findings use the same definition of "Investment Entity" as the Liberty Plan—that is, an "Investment Entity" is a "single purpose limited liability entit[y] set up to acquire assets, each of which would be capitalized by funds provided by Liberty." Jan. 25 Findings at ¶II.17.

[53] Jan. 25 Findings at ¶II.16.

[54] *See* Jan. 25 Findings at ¶¶1 and 7.

[55] *See* Renewed Emergency Motion for Turnover of Property of the Estate and Books and Records Relating to Property of the Estate [Liberty Doc. No. 116].

[56] *See* Transcript of Evidentiary Hearing Conducted on June 22, 2016 at 85–87 [Liberty Doc. No. 152] (testimony of Samantha Galapin that Ms. Gao supervised the shredding of documents).

Liberty's books and records that were not destroyed were ultimately turned over to Mr. Perkins and the Liberty Committee. The remaining books and records were insufficient to permit the compilation of "even a rudimentary overview of [Liberty's] financial operations."[57] Even attempts by the Liberty Committee to obtain records from third parties did not produce "a coherent or consistent set of underlying records on which [Liberty] based its business."[58]

Certain public filings pertaining to Oak River remain available. The *Limited Liability Company Articles of Organization* (the "Articles of Organization") for Oak River's predecessor-in-interest, JPM 6 Unity Project LLC ("JPM 6"), were filed with the California Secretary of State (the "Secretary of State") on April 30, 2010.[59] The Articles of Organization specified that JPM 6 would be managed by more than one manager.[60] On August 13, 2010, Mr. Kirk filed a *Limited Liability Company Certificate of Amendment* (the "Certificate of Amendment") with the Secretary of State, changing the name of JPM 6 to Oak River Asset Management LLC.[61] The Certificate of Amendment stated that Oak River would be managed by one manager, and designated that manager as Mr. Kirk.[62]

On April 25, 2014, Oak River filed a *Statement of Information* with the California Secretary of State, which stated that Hanna Cosman was the manager of Oak River.[63] As the Court found in the Kirk/Gao Adversary Proceeding, Hanna Cosman (aka Helena Hanna Cosman) had signature authority to transfer Liberty funds with respect to certain bank accounts.[64] On March 12, 2015, Oak River filed an additional *Statement of Information* with the California Secretary of State, which stated that Mr. Kirk was the manager of Oak River.[65] On December 7, 2016, Ms. Gao filed a *Certificate of Cancellation* with the California Secretary of State for Oak River, which stated that all the members of Oak River had voted to dissolve the entity.[66]

## C. Movants are Judicially Estopped from Contending that Liberty Was Not Affiliated with Oak River at the Time the Purchase and Sale Agreements Were Executed

Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). "[T]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *Id.* at 750. The doctrine typically applies if the following three factors are satisfied: (1) a party's later position is clearly inconsistent with its earlier position; (2) that party has succeeded in persuading the Court to adopt its earlier position; and (3) allowing the party to prevail in its later inconsistent position would impose an unfair detriment on the opposing party absent estoppel. *Id.* 750–51.

---

[57] *See* First Amended Disclosure Statement in Support of Chapter 11 Plan of Liquidation Dated January 31, 2018 Proposed by Official Unsecured Creditors' Committee for Liberty Asset Management Corporation [Liberty Doc. No. 609] at ¶V.A.

[58] *Id.*

[59] *See* Declaration of David S. Henshaw in Support of Response to Objection to Claim [Oak River Doc. No. 162] (the "Henshaw Decl.") at ¶5 and Ex. A.

[60] *Id.* at Ex. A.

[61] *Id.* at Ex. B.

[62] *Id.*

[63] *Id.* at Ex. C.

[64] *See* Jan. 25 Findings at ¶5.

[65] *Id.* at Ex. D.

[66] *Id.* at ¶9 and Ex. E.

For purposes of applying estoppel, the Court imputes the prepetition actions of Liberty to the Plan Administrator. This is appropriate because under the Liberty Plan, the Plan Administrator is the successor-in-interest to Liberty.[67]

As discussed, the Plan Administrator and Oak River have both taken the position that Liberty holds a 100% equity interest in Oak River. By confirming the Liberty Plan, the Court has adopted this position. Movants' position that Liberty held a 100% ownership interest in Oak River as of the date of confirmation of the Liberty Plan is clearly inconsistent with Movants' position that Liberty did not own and was not affiliated with Oak River at the time the Purchase and Sale Agreements were executed.

The Plan Administrator and Oak River attempt to avoid the consequences of the position they have taken by asserting that confirmation of the Liberty Plan established only that Liberty beneficially owned Oak River; that beneficial ownership is not the same as legal ownership; and that as a result, Oak River was not an "affiliate" of Liberty at the time the relevant transactions occurred. The distinction that Movants attempt to make is unavailing. The Court confirmed the Liberty Plan, and in doing so accepted that Liberty beneficially owned Oak River, after having found that Oak River, like Liberty's other Investment Entities, was used by Liberty as a vehicle to facilitate its business objectives. The finding that Liberty controlled and directed Oak River's management was a prerequisite to the finding that Liberty beneficially owned Oak River. As further discussed in Section II.D., below, an "affiliate" relationship exists where one corporation controls another. That is, the same facts that establish Liberty's beneficial ownership of Oak River also establish that Liberty is an affiliate of Oak River.

Movants further attempt to distinguish their position by emphasizing that although they have asserted that Liberty beneficially owned Oak River as of the date of confirmation of the Liberty Plan in 2018, they have never asserted that Liberty owned or was affiliated with Oak River when the relevant transactions took place in October 2012, November 2012, and February 2013. This manufactured distinction is not sufficient to permit Movants to escape the application of judicial estoppel. Movants have persuaded the Court that Liberty beneficially owned Oak River as of the petition date, based upon Liberty's use of Oak River as an Investment Entity created to acquire and hold properties on Liberty's behalf. It defies logic for Movants to then assert that at the time of the transactions pertaining to the Furlong Property, Oak River was not beneficially owned by Liberty—but then at some unspecified future time became beneficially owned by Liberty based upon the same transactions.

Allowing Movants to contest that Liberty owned and was affiliated with Oak River at the time of execution of the Purchase and Sale Agreements would impose an unfair detriment upon the Claimants. Were Movants not estopped from asserting this inconsistent position, the distribution to Claimants would be markedly reduced. At the same time, the Plan Administrator would unfairly benefit by obtaining a greater distribution from Oak River's estate.

Application of judicial estoppel is especially appropriate given the destruction of the evidence that would likely have enabled Claimants to more easily show the affiliate relationship between Liberty and Oak River. As noted, for purposes of applying judicial estoppel, the Court imputes Liberty's actions to the Plan Administrator. It would be inequitable to permit the Plan Administrator to benefit from Liberty's destruction of records. It would similarly be inequitable to allow Oak River to benefit from the destruction of records by escaping liability for the full amounts of the claims against it.

---

[67] Liberty Plan at 24.

**D. Even Absent the Application of Judicial Estoppel, the Evidence Shows that Oak River
Was an Affiliate of Liberty at the Time the Purchase and Sale Agreements Were Executed**

The result would not change even if the Court declined to judicially estop Movants from
contesting Oak River's status as an affiliate of Liberty at the time the Purchase and Sale
Agreements were executed. As set forth below, the evidence shows that Oak River was an
affiliate of Liberty at the time of the transactions.

Consistent with choice of law provisions contained within each Purchase and Sale
Agreement,[68] the Court construes the Agreements in accordance with California law. Cal. Corp.
Code §150 provides:

> A corporation is an "affiliate" of, or a corporation is "affiliated" with, another specified
> corporation if it directly, or indirectly through one or more intermediaries, controls, is
> controlled by or is under common control with the other specified corporation.

"Control typically involves authority to direct the management of an entity." *Otay Land Co.,
LLC v. U.E. Ltd., L.P.*, 15 Cal. App. 5th 806, 857, 225 Cal. Rptr. 3d 119, 160 (Ct. App. 2017),
*reh'g denied* (Oct. 13, 2017), *review denied* (Dec. 13, 2017).

As set forth above, AHA executed the AHA Purchase and Sale Agreement on November 27,
2012; the Lee Investors executed the Lee Purchase and Sale Agreement on February 25, 2013;
and YCJS executed the YCJS Purchase and Sale Agreement in October 2012. The Court finds
that at the time each Purchase and Sale Agreement was executed, Oak River was managed and
controlled by Liberty and was therefore an "affiliate" of Liberty within the meaning of Cal.
Corp. Code §150.

As a result of the destruction of records overseen by Ms. Gao, there is limited documentation
evidencing the business relationship between Liberty and Oak River. The documentary evidence
that does remain indicates the existence of an affiliate relationship. As the Court found in the
Kirk/Gao Adversary Proceeding, "[a]t all times since its formation, Benjamin Kirk was Liberty's
President, CEO, CFO, and sole shareholder."[69] At the time each Purchase and Sale Agreement
was executed, Mr. Kirk was Oak River's manager, according to the *Statement of Information* on
file with the Secretary of State.

Mr. Kirk's status as Oak River's manager is strong evidence that Liberty controlled and
directed the management of Oak River. As discussed at length in the *Memorandum of Decision
Finding that Plaintiff is Entitled to Judgment Against Defendants in the Amount of
$74,140,695.29* (the "Memorandum of Decision") issued in the Kirk/Gao Adversary Proceeding,
Liberty disregarded corporate formalities in the operation of its business. Liberty formed
Investment Entities "to acquire and hold assets, including real properties, for the benefit of
Liberty and/or its investors."[70] (For purposes of this discussion, "Investment Entity" means "a
single purpose limited liability entity set up to acquire assets, which was capitalized with funds

---

[68] Each Purchase and Sale Agreement contains the following choice of law provision: "The validity, interpretation,
and performance of this Agreement shall be governed and construed and interpreted in accordance with the laws of
the State of California." *See* Chang Decl. at Ex. A, ¶13.1 (AHA Purchase and Sale Agreement); Lee Decl. at Ex. A,
¶13.1 (Lee Purchase and Sale Agreement); and Wang Decl. at Ex. A, ¶13.1 (YCJS Purchase and Sale Agreement).
[69] Memorandum of Decision Finding that Plaintiff is Entitled to Judgment Against Defendants in the Amount of
$74,140,695.29 [Doc. No. 141, Case No. 2:16-ap-01337-ER] (the "Memorandum of Decision") at 3.
[70] *Id.* at 3.

provided by" Liberty.[71]) Although the Investment Entities were crucial to Liberty's business of acquiring properties, Liberty ignored corporate formalities when using the Investment Entities to facilitate business objectives. For example, as the Court found in the Kirk/Gao Adversary Proceeding, membership interests in nine of Liberty's other affiliated Investment Entities were vested in Ms. Gao's name, even though such entities were created in furtherance of Liberty's business interests and even though all property held by such entities was owned by Liberty.[72] Therefore, contrary to the Plan Administrator's argument, the fact that it was Mr. Kirk, not Liberty, that was designated as a manager of Oak River on filings with the Secretary of State does not suggest that Liberty was not affiliated with Oak River.

The timing and structure of transactions pertaining to the Furlong Property show that Liberty used Oak River to further its business objectives in the same way at it used its other affiliated Investment Entities. As with its other Investment Entities, Liberty used Oak River to hold assets—in this case, the Furlong Property—for the benefit of its investors (the Claimants). Again, the absence of corporate formalities does not undermine Oak River's status as an affiliate with Liberty. Quite the opposite; that Liberty's relationship with Oak River bore all the hallmarks of its relationship with other Investment Entities that Liberty controlled—including a disregard of corporate formalities—further solidifies the case that Liberty controlled and directed the management of Oak River.

**E. Movants are Estopped from Relying Upon the Statute of Frauds to Prevent Claimants from Recovering Against Oak River**

The Statute of Frauds, codified at Cal. Civ. Code §1624, provides in relevant part:

> (a) The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent:
> …
>> (3) An agreement for the leasing for a longer period than one year, or for the sale of real property, or of an interest therein; such an agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged.

Cal. Civ. Code §1624(a)(3).[73]

As to Oak River, the Purchase and Sale Agreements fall within the Statute of Frauds. The Agreements involve the sale of real property and are not signed by Oak River. If any signed writing evidencing Oak River's authority to act as an agent for Liberty in the acquisition of the Furlong Property ever existed, it has been destroyed.

In *Kipperman v. Dixson (In re Diego's Inc.)*, 88 F.3d 775, 778–79 (9th Cir. 1996), the court estopped a purchaser from relying upon the Statute of Frauds to avoid performing under his agreement to purchase property from the bankruptcy estate. The *Diego* court noted that under California law, "[t]he doctrine of estoppel to assert the statute of frauds applies where unconscionable injury would result from denying enforcement of the oral contract after one party has been induced by the other seriously to change his position in reliance on the contract...."

---

[71] Liberty Plan at 9.

[72] *See* Memorandum of Decision at 3–4.

[73] The Statute of Frauds was amended in 2015; however, no changes were made to the provisions quoted herein. The quoted language was in effect as of the date of the execution of the Purchase and Sale Agreements.

*Diego*, 83 F.3d at 778 (citing *Isaac v. A & B Loan Co.,* 201 Cal.App.3d 307, 313, 247 Cal.Rptr. 104 (1988)). The court reasoned that the bankruptcy trustee had "seriously changed his position to his detriment by relying on the oral contract" with the purchaser by turning down other purchaser offers. *Id.*

The Plan Administrator and Oak River are estopped from relying upon the Statute of Frauds to defeat Claimants' ability to recover against Oak River's estate. As discussed above, for purposes of applying the doctrine of estoppel, the Court imputes Liberty's actions to the Plan Administrator, because the Plan Administrator is the successor-in-interest to Liberty under the Liberty Plan.[74]

Claimants invested substantial funds after executing the Purchase and Sale Agreements. In so investing, Claimants relied, to their detriment, upon Liberty's representation that either Liberty or one of its subsidiaries or affiliates would acquire the Furlong Property on their behalf. It would be highly inequitable to permit the Plan Administrator and Oak River to benefit from Liberty's destruction of the records that would make it easier for the Claimants to establish Liberty's affiliate relationship with Oak River. In addition, the concern normally animating application of the Statute of Frauds—insuring that only legitimate transactions are enforced—are minimized here, because certain signed writings (the Purchase and Sale Agreements) remain extant. Movants are estopped from relying upon the Statute of Frauds to defeat Claimants' ability to recover Oak River's estate.

### F. Movants' Remaining Arguments Lack Merit

Movants make much of the fact that Oak River was not a "named party" to any of the Purchase and Sale Agreements. This distinction is immaterial. A contract may use shorthand to define key terms, provided that the definitions are clearly ascertainable. As discussed, Oak River was an affiliate of Liberty at all relevant times.

A contract enforceable against multiple corporate entities, where those entities conduct business as part of a larger economic enterprise, is not unusual. Many corporations conduct business in this manner, as it allows them to obtain tax and regulatory advantages. Corporations that so conduct business can, and frequently do, enter into contracts that are enforceable against each specific corporate entity within the larger economic enterprise. It is permissible for such a contract to incorporate the subsidiary entities through shorthand language similar to that used in the instant contracts. Such shorthand is often a necessity—large enterprises often conduct businesses through hundreds of subsidiaries; listing the name of each subsidiary would make a contract unwieldy. It is worth emphasizing that although Liberty used affiliated entities for fraudulent ends, there is nothing *per se* illegitimate about either a corporation's use of subsidiaries to conduct business, or the use of contracts containing shorthand language incorporating multiple subsidiaries by reference.

Because each Purchase and Sale Agreement is, by its terms, enforceable against Oak River, Claimants are entitled to receive a distribution from Oak River's estate. There is no dispute that Oak River held title to the Furlong Property but failed to transfer such title to the Claimants, as required by the Purchase and Sale Agreements. Therefore, Claimants are entitled to recover from Oak River for breach of contract. It is not necessary for the Court to consider whether Claimants might also be entitled to recover against Oak River under any of the other theories asserted.

Movants contend that allowing Claimants to recover against the Oak River estate would enable Claimants to receive a greater distribution, to the detriment of other investors who were

---

[74] Liberty Plan at 24.

also defrauded by Liberty. This argument overlooks the fact that Claimants have identified contracts giving rise to a right to be paid from Oak River's estate. The practical effect of acknowledging Claimants' contractual rights will be a reduction in the distribution to other victims of Liberty's fraudulent activities. However, there is nothing nefarious about this result, as Movants imply. Oak River's estate has not been substantively consolidated with Liberty's estate. Unless and until it is shown that the substantive consolidation of both estates is an appropriate remedy, the simple reality is that the recoveries obtained by creditors of Oak River's estate will vary from the recoveries obtained by creditors of Liberty's estate.

### G. Claimants Are Not Entitled to Interest

Claimants assert that they are entitled to 10% interest on the amounts they invested. Claimants assert that they are entitled to prejudgment interest pursuant to Cal. Civ. Code §3288, which provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury."

The Court declines to award the prejudgment interest sought by the Claimants. Cal. Civ. Code §3288 applies to actions "for the breach of an obligation *not* arising from contract …." (emphasis added). The statute does not apply to the instant claims, which arise from a contractual breach. *See, e.g.*, *Segura v. McBride*, 5 Cal. App. 4th 1028, 1040, 7 Cal. Rptr. 2d 436, 444 (1992) ("Section 3288 provides for prejudgment interest in actions other than contract …. Segura's claim was for unliquidated damages on an action other than contract and, thus, comes within the purview of section 3288.").

Even if Cal. Civ. Code §3288 did apply, the Court would not exercise is discretion to award prejudgment interest. Awarding prejudgment interest would substantially increase Claimants' claims, thereby reducing the distribution from Oak River's estate to Liberty's estate. The effect would be to further reduce the recovery to Liberty's other creditors, who were also a victim of its fraudulent business practices.

Therefore, the portion of the claims based upon prejudgment interest is disallowed. Each claim shall be limited to the amount initial invested in connection with the Purchase and Sale Agreements.

## III. Conclusion

Based upon the foregoing, the Court finds that AHA holds a general unsecured claim in the amount of $720,000; that YCJS holds a general unsecured claim in the amount of $900,000; and that the Lee Investors hold a general unsecured claim in the amount of $900,000.

Claimants have filed identical claims against the Liberty and Oak River estates. Claimants seek payment from the Liberty estate only to the extent that funds in the Oak River estate will be insufficient to pay their claims in full. As discussed, each Purchase and Sale Agreement was entered into by "Liberty Asset Management Corporation and its respective parent or subsidiary companies and affiliates …." Therefore, the Purchase and Sale Agreements are enforceable against both the Oak River estate and the Liberty estate. The Court finds that to the extent the Oak River estate does not contain funds sufficient to pay Claimants' claims in full, Claimants are entitled to assert a claim for the remaining unpaid amounts against Liberty's estate.

The Court will enter orders consistent with this Memorandum of Decision.

###

Date: January 7, 2019

Ernest M. Robles
United States Bankruptcy Judge